Estate of John H. Engwall, Deceased, Stina Carlson and Oscar Jacobson, Co-Administrators v. Commissioner.
Estate of Engwall v. Commissioner
Docket No. 45018.
United States Tax Court
T.C. Memo 1956-6; 1956 Tax Ct. Memo LEXIS 290; 15 T.C.M. (CCH) 29; T.C.M. (RIA) 56006; January 16, 1956
*290 Increase in net worth. - Decedent had an estate of some $166,000 at time of his death in 1949. He had not filed returns since 1937. Opening net worth determined and the increase in net worth in the intervening years held to be income for such years and properly to be allocated ratably over such years. Penalties. - Delinquency penalties sustained. Recoupment. - Claimed offset of barred overpayment of estate tax against income tax deficiencies in these proceedings is not within the jurisdiction of this Court. R. C. Pierce, Esq., 10 LaSalle Street, Chicago, Ill., for the petitioners. J. Bruce Donaldson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes *291 of petitioner's decedent, and delinquency penalties for the years and in the amounts as follows: Penalty Under
Year
Income Tax
Section 291(a)
1939
$ 459.99
$ 115.00
1940
530.50
132.63
1941
1,128.03
282.01
1942
1,875.32
468.82
1943
2,597.96
649.49
1944
1,927.24
481.81
1945
1,801.84
450.46
1946
1,444.04
361.01
1947
1,444.04
361.01
1948
1,291.24
322.81
Period 1-1-49 to
8-13-49
775.76
193.94
Total
$15,275.96
$3,818.99
In the absence of any records of the income of the decedent for the above period, the respondent reconstructed income by determining the amount of the increase in the decedent's net worth in that period and spreading the increase evenly over the period. The petitioner alleges error in the respondent's determination that the decedent had any income in excess of interest and dividends, in failing to consider available records, in the determination of net worth at the beginning of the period, and in determining the deficiencies in an arbitrary and capricious manner. A claim is also made for the offset of overpaid estate tax against the income tax deficiencies. Findings of Fact Some of the facts have been stipulated *292 and by this reference are found as stipulated. The petitioner is the estate of John H. Engwall who died intestate on August 13, 1949. The decedent residedt at 1912 Lincoln Park West, Chicago, Illinois, at the time of his death. The decedent was born August 27, 1879. He was an only child. He never married. He lived with his father and mother until the death of his father, Andrew W. Engwall, in 1915. Thereafter he lived with his mother and supported her until her death in 1943. After his mother's death and until his death, he continued to reside in the same three-room apartment in which he had lived with his mother. His death was sudden, and occurred while he was in another city attending a convention of a fraternal organization. The decedent's father was believed to have been successful in his business operations. He loaned money to immigrants from Sweden, which was his native country, and for a number of years operated a well patronized tavern which was situated in a good location, across the street from a harvester manufacturing plant. He sold that tavern about 1910 and retired for a while, but in order to have something to do he acquired another tavern which he operated for *293 a few years. It was not a profitable enterprise. The decedent was the administrator of his father's estate. The assets in that estate amounted to $4,015.33, which, after expenses was distributed as follows: $1,883.89 to John H. Engwall (the decedent herein) and $1,941.89 to the widow, Charlotte Engwall. No estate was probated on the death of the decedent's mother. Agents of the respondent searched the probate records from 1915 to 1949 and also searched the gift tax records but found no record of the decedent's having received any other inheritance or gift. The agents of the respondent also made a reasonable investigation in an attempt to find any business or source of income of decedent during the years in controversy, but, except as pointed out herein, found none. The investigation included examination of records of the collector of internal revenue for the period 1913 to 1949, a Chicago newspaper morgue, personal and business directories, probate court records, bank records, some 50 volumes of county real estate records, title company records, and bond purchase and sale records of the Treasury Department. In 1901 the decedent was admitted to the practice of law in Illinois. He *294 engaged in the practice of law some time thereafter and prior to the year 1919. Along with his law practice he carried on an advertising business in which he advertised the products of others in various rural publications. Neither of these ventures was profitable. Also at some time prior to 1919 he operated a small book store in Chicago which was not a profitable venture, and his father was required to furnish him with cash to carry on the project. On October 4, 1919, the decedent became a full-time employee of the Chicago Title & Trust Company, at a starting salary of $25 per week. He remained in that employment until March 15, 1938. During that period of employment with the Chicago Title & Trust Company (including his retirement pay) the decedent was paid a total of $69,778.50. These payments, by years, were as follows: Salary Received From
Chicago Title & Trust
1919
$ 325.00
1920
2,400.00
1921
2,585.00
1922
2,600.00
1923
2,845.00
1924
3,105.00
1925
3,630.00
1926
4,080.00
1927
4,160.00
1928
4,160.00
1929
4,640.00
1930
4,680.00
1931
4,680.00
1932
4,374.00
1933
3,793.50
1934
4,032.00
1935
4,212.00
1936
4,212.00
1937
4,212.00
1938
1,053.00
Total
$69,778.50
*295 There is no record of the decedent's having filed income tax returns for any years prior to the year 1920. For each of the years 1920 to 1937, inclusive, the decedent filed income tax returns on which he showed amounts of income tax as set out below. The returns are no longer in existence. Based on the tax reported at the prevailing rates, the decedent's net taxable income for each of those years was the amount shown in the following tabulation: Taxable
Tax Shown
Net Taxable
Year
on Return
Income
1920
$36.40
$2,910.00
1921
36.07
3,401.75
1922
52.90
3,822.50
1923
73.68
4,956.00
1924
29.44
4,462.50
1925
24.45
5,505.33
1926
24.45
5,505.33
1927
16.81
4,994.00
1928
13.17
4,670.67
1929
4.13
4,602.00
1930
11.06
4,483.33
1931
12.56
4,616.67
1932
69.99
4,249.75
1933
46.56
3,664.00
1934
85.47
5,039.95
1935
60.16
4.425.20
1936
42.82
3,967.22
1937
40.97
3,915.83
Total
$79,192.03
The respondent's records disclose that no income tax returns were filed by the decedent for the years 1938 to 1948, inclusive. In 1951 the administrators of his estate filed an income tax return for him for the period January 1, 1949 to *296 August 13, 1949, in which they reported gross income of $535 and no tax due. In 1945 or 1946 the decedent rented a small office in the Consumer's Building in Chicago. The rental was $20 or $25 per month which he paid by check. He occupied the office for a period of two or three years. The furniture that he moved into the office consisted of a desk and a chair. He had no employees in the office. His name appeared on the office door and also the name Acme Advertising Service. The only papers that were seen in his office were out-of-town country newspapers. A bank account maintained in the name of Acme Advertising Service at The First National Bank of Chicago was an account solely owned by the decedent. The account was opened on January 23, 1939, with a deposit of $582.96. The year-end balances in the account from the date of opening to the date of the decedent's death were as follows: 1939
$ 577.89
1940
515.89
1941
790.32
1942
900.15
1943
866.27
1944
2,296.27
1945
2,041.50
1946
3,129.85
1947
4,291.04
1948
2,098.85
1949
2,311.11
The decedent at all times in his adult life was shabby in appearance, wore patched and frayed clothing, and apparently *297 spent very little. When he had an office in the Consumer's Building he carried with him daily a shopping bag and shopped for food. The furniture in his apartment was very poor, and the whole lot was sold by his administrators for $9. He never owned an automobile. His only known extravagance was his annual attendance at a fraternal convention. On the appointment of the administrators of the decedent's estate they inspected the decedent's apartment. It was in a very disorderly condition, and contained a lot of old soiled clothing and old umbrellas. No books or records pertaining to the decedent's business affairs were found in the apartment. Cash in the amount of $168 was found in a tobacco can, and various smaller sums of cash were found in old books. The key to the decedent's apartment and a safe deposit key were on the decedent's person and turned over to the administrators. The safe deposit box was located in the First National Bank of Chicago. It was found to contain a few small pieces of jewelry and foreign coins, several bank books, some $23,000 in cash, and municipal and Federal government bonds. The bank books found in the sale deposit box disclosed that the decedent then *298 had deposit accounts in nine banks in Chicago in addition to the account carried in the name of Acme Advertising Service. He had also previously had two other bank accounts which had been closed out in 1931. The year-end totals in all of the accounts, including that of Acme Advertising Services were as follows: Year
Year End Totals
1925
$ 200.00
1926
3,032.00
1927
1,232.00
1928
904.03
1929
2,222.00
1930
4,846.73
1931
2,532.00
1932
2,406.00
1933
120.01
1934
1,522.00
1935
2,650.00
1936
12,920.00
1937
16,386.10
1938
19,860.14
1939
27,465.51
1940
28,075.89
1941
29,434.32
1942
30,484.15
1943
30,870.27
1944
32,252.77
1945
32,373.55
1946
33,792.14
1947
35,400.37
1948
33,645.10
1949
34,511.11
At the date of decedent's death he owned municipal bonds which had a face value of $79,000. These had been acquired in the years 1921 to 1949, inclusive, in an aggregate face amount of $86,500, and in the years 1923 to 1935 he had sold some in the face amount of $7,500. The net cumulative totals are as follows: Year
Cumulative Totals
1921
$ 1,000
1923
3,500
1928
2,500
1935
7,500
1940
16,500
1941
17,500
1942
32,500
1943
42,500
1945
47,500
1946
52,500
1947
57,500
1948
83,500
1949
86,500
Sold at various dates
$ 7,500
On hand at date of death
$79,000
*299 At the date of death the decedent owned United States Government bonds Series E and G as follows: Year
Acquired
Series
Face Amount
1941
E
$ 3,000
1942
G
5,000
1943
G
2,000
Total
$10,000
At the date of death the decedent owned United States Treasury bonds in the face amount of $18,400. Of these, $15,400 were 1955-60 series, 2 7/8 per cent interest, and $3,000 were 1951-55 series, 3 per cent interest. The date of acquisition of these bonds is not known. At the date of death the decedent owned 100 shares of stock in Illinois Brick Company which he had acquired in 1930. The cost of the shares is not known. These were sold by the decedent's estate for a net amount of $1,258.09. In 1933 the decedent acquired a parcel of land from a Chicago bank, as trustee, under a deed on which documentary stamp tax was 50 cents, tending to indicate a consideration or value of from $100 to $500 (Section 725, Revenue Act of 1932). The decedent conveyed that parcel to others on June 24, 1942, by warranty deed. The documentary tax stamps attached to the deed would tend to indicate a consideration in the amount of $7,000. In 1935 a parcel of land was conveyed to the *300 decedent by warranty deed. The tax stamps attached to the deed amounted to 50 cents, tending to indicate a consideration or value of from $100 to $500. That parcel was conveyed to others by the decedent by warranty deed recorded on November 12, 1941. The tax stamps attached would tend to indicate a consideration in the amount of $10,800. The decedent acquired either one or two pieces of rental property some time in the 1930's. He sold one about 1946. The record does not show the amounts of rental received, but the decedent had told his cousin that the rental was not profitable. The decedent's administrators converted his properties to cash. The total cash received by the administrators, including cash on hand and the bank deposits, amounted to $169,777.54. Of this total, $166,240.65 represented assets owned by the decedent at the date of his death, and the remaining $3,536.89 represented earnings on the principal during the period of probate. Of the principal of $166,240.65 representing assets owned by the decedent at the date of death, the sum of $28,618.23 represents assets (cash of $19,860.14 on deposit, municipal bonds of $7,500, and the 100 shares of Illinois Brick Company, *301 cost unknown, but included at $1,258.09, the amount at which they were sold by the estate) that are known to have been acquired by the decedent prior to January 1, 1939. Assets on which the administrators received $96,150.97 (exclusive of interest) are represented by bank deposits made after December 31, 1938, and securities acquired after that date. Of the total assets of $166,240.65 held at time of death, an amount of $41,461.45 represents assets, the acquisition dates of which are unknown. These consisted of cash on hand and in safe deposit box, and the U.S. Treasury bonds, hereinabove referred to, in the amount of $18,400. The figures in this paragraph do not include any amounts on account of real estate. The decedent was not known to have owned any real estate at the date of his death. Disbursements by the administrators during the period of administration amounted to $43,444.69 which included $5,000 set up as a reserve for possible income tax deficiency and for possible adjustment of Federal estate tax. The balance of $126,332.85 ($169,777.54 minus $43,444.69) was distributed to 31 first cousins of the decedent in the amount of $4,075.25 to each of some and $4,075.26 to each *302 of others. The administrators filed a Federal estate tax return on April 11, 1950. It was examined and recommendation was made for acceptance as filed. The estate tax shown thereon in the amount of $19,024.74 was paid. The period of limitation for the adjustment of the estate tax liability expired on August 11, 1953. No liability for Federal income tax of the decedent was used in the computation of the estate tax liability. If the income tax liability of the decedent existing at the date of his death (as finally determined in this proceeding) had been used as a deduction in computing the liability for estate tax, it would have reduced the amount of estate tax determined and paid. The respondent determined that in the period from January 1, 1939 to August 13, 1949, there was an increase in the decedent's net worth of $99,973.15, and treated that amount as his net income for the period. The respondent took $66,267.50, the total earnings of decedent as an employee of the Chicago Title & Trust Company up to his retirement in 1938, as decedent's net worth at January 1, 1939, and subtracted that figure from the value of decedent's estate at date of death, $166,240.65, and thus arrived *303 at the net increase of $99,973.15. This amount he spread ratably over the period, treating $9,287.22 as being income in each of the years 1939 to 1948, inclusive, and $5,347.20 as income for the period January 1 to August 13, 1949. [1] In computing the deficiencies the respondent reduced the income that was so determined by amounts of tax-exempt interest from municipal bonds and for personal exemptions. He allowed standard deductions from gross income for the years in which such deductions are allowable. No income tax returns were filed by the decedent for any of the years 1939 to 1948, inclusive. An income tax return for the decedent for the period January 1, 1949 to August 13, 1949, was filed by the coadministrators in 1951. Opinion ATKINS, Judge: The respondent has determined deficiencies in income tax based on an amount that he determined to represent an increase in the decedent's net worth over the period that began with January 1, 1939, and ended with the date of death of the decedent, August 13, 1949. The respondent's *304 starting point was the amount of $66,267.50 which he determined had been received by the decedent from the title company in the 20-year period of employment there. The terminal point of the respondent's determination was the figure of $166,240.65 which is set forth in the notice of deficiency as the value of the decedent's estate comprised of the following major categories: Cash
$ 57,732.60
U.S. Treasury bonds
18,400.00
U.S. Savings bonds
10,000.00
Municipal bonds
79,000.00
Stock
1,050.00
Miscellaneous
58.05
Total
$166,240.65
Counsel for the petitioner argues that the reasonable inferences to be drawn from the evidence are against the decedent's having had substantial income in the taxable period; that while not much is known about the decedent's early business and professional activities, his known frugality makes it reasonable to assume that he saved a substantial portion of whatever earnings he realized. Also, it is pointed out, that in the prime years of the decedent's life when he was employed by the title company his earnings did not reach an annual average of $4,000. In the later period of the decedent's life it is pointed out that his only known *305 activity was the operation of a small advertising business which produced little or no income, and that he could not have had much interest income based on the meager yield of his bonds. Counsel also refers to the opinion of one witness that in the years in question the decedent's mind was not clear and that he could not have engaged in business successfully. After fully considering the record and the contentions of both parties, we have concluded that this is a case where resort to a net worth method of determination of income is amply justified. In reaching our conclusion we have been appreciative of the difficulties that confront the petitioner in contesting the respondent's determination. It was said in Holland v. United States, 348 U.S. 121, that where the basic assumption that most assets derive from a taxable source is not true, "the taxpayer is in a position to explain the discrepancy." Here the taxpayer who might give an explanation of the increase in net worth is dead. He left no records that are helpful to his administrators. It also appears that he was secretive by nature and did not confide in others as to his business affairs. His administrators are his *306 first cousins, one of whom saw the decedent fairly frequently but never learned anything about the decedent's affairs. One witness expressed his opinion that the decedent may have acquired property from his father by gift or inheritance, but nothing was known by his relatives or other acquaintances that gave substance to this and the respondent's investigation failed to disclose any such gift or inheritance. At death and during the taxable period the decedent was possessed of substantial property. As far as is known, he had nowhere near that quantity of property at the beginning of the period. The rather constant increase over the years in controversy of the bank accounts and the bond holdings, strongly indicate that the decedent had a substantial source of income in those years, over and above any income from his bank accounts and security holdings. We must assume, under the basic rule referred to in the Holland case, that the increase in net worth derived from taxable sources. Apparently the decedent kept no record of his income; at least none has been found by his administrators other than bank books. In contesting the deficiencies, the petitioner points out that of the two *307 factors used in the respondent's net worth calculation, only one, namely, the net worth at the time of death, is known. It says that there is no evidentiary basis to support the respondent's treatment of the decedent's earnings while employed by the title company as the decedent's net worth at the beginning of the taxable period. It is, of course, an essential condition to the validity of a net worth calculation that an opening net worth be established with reasonable certainty to serve as a starting point. Holland v. United States, supra, see also Thomas v. Commissioner, 223 Fed. (2d) 83, in which the Court said: "Despite the essential difference between the burden of proof in a criminal case and that in a Tax Court deficiency determination, we see no reason why the determination of opening net worth should be any less vital to the validity of the method of computation invoked in the one type of case than in the other." In this case the respondent has not rested on the presumption of correctness that attaches to his determination, but has actively endeavored to establish the amount of beginning net worth. His representatives have made investigations *308 that indicate what seems to us to be an unusual degree of diligence. The results of much of this investigative work were negative. The pertinent facts that it did produce are set out in our findings of fact. The assets owned by the decedent at death amounted to a total of $166,240.65. Of the money and property making up that figure, the respondent was able to ascertain the bank deposit date or acquisition date of $124,769.20, of which only $28,618.23 was ascertained to have been acquired prior to January 1, 1939. However, instead of using this latter figure, the respondent used the amount of $66,267.50, stated by him to be the amount of the decedent's earnings through 1938 (on which he paid income tax) based on information obtained from the title company by which decedent had been employed from 1919 until early 1938. The respondent did not reduce this figure by any amount on account of living expenses over those years. Thus, the figure used by the respondent was generous in amount compared with the value of assets now known to have been acquired before 1939. It now develops that decedent's actual earnings from the title company amounted to $69,778.50. Based upon the whole record, *309 we approve the use by the Commissioner of the net worth method of computing the decedent's income for the years in question. Furthermore, for lack of any evidence upon which a better allocation of income over the years can be made, we think that it was not error for the respondent to spread the increase in net worth evenly over the years in the taxable period. [2] There is no reason to believe that this method of allocation is inequitable from the standpoint of the taxpayer. However, it is our opinion that a more realistic figure representing net worth at January 1, 1939, would be $70,089.68, which consists of the value of the assets held at time of death which were known to have been held at January 1, 1939 ($28,618.23), plus the value at date of death of the assets as to which the date of acquisition was unknown ($41,471.35). We consider it fair to assume that the latter assets were owned at January 1, 1939. Furthermore, since these assets consisted almost entirely of cash and bonds, we may assume that the value substantially represents cost. This figure of $70,089.68 closely approximates the actual earnings which the decedent received over the years from the title company. It is *310 about $10,000 less than the total income which the returns of the decedent for the years 1920 to 1937 would indicate was received, but over that span of years the taxpayer must have expended at least the difference for living expenses. Upon recomputation the figure of $70,089.68 will be used as net worth at January 1, 1939, instead of the figure of $66,267.50 used by the Commissioner in the notice of deficiency. The petitioner urges us to reject the respondent's determination as being without rational foundation, citing Helvering v. Taylor, 293 U.S. 507. However, for the reasons indicated above we do not consider the respondent's determination as being without rational foundation. On the other hand, we do not rest our decision upon the ground that petitioner has failed to meet its burden of proof, but, rather, have reached our conclusion upon the stipulated facts, plus all the evidence presented at the hearing. The assertion of delinquency penalties, reduced in amounts based on the reduced taxes that will follow from increasing the beginning net worth, must be approved. No returns were filed for the years 1939 to 1948, inclusive, and the return for the period January *311 1 to August 13, 1949, was not filed until some time in 1951. No reasonable cause has been shown for the delinquency. See section 291(a), Internal Revenue Code of 1939. The petitioner claims that if deficiencies are found in this proceeding they should be offset by an overpayment of Federal estate tax. As has been stipulated, any outstanding income tax liability of the decedent would reduce the amount of estate tax. Petitioner's counsel, while claiming this right of recoupment, with commendable frankness concedes that there is doubt as to our power to grant it. The offsetting of a barred overpayment against a deficiency is not within our jurisdiction. Section 272(g), Internal Revenue Code of 1939; Commissioner v. Gooch Milling & Elevator Co., 320 U.S. 418. Decision will be entered under Rule 50. Footnotes
1. These figures add up to a total of $98,219.40. The difference between that sum and the determined increase in net worth of $99,973.15 is not explained.↩
2. Cf. United States v. Ridley, 120 Fed. Supp. 530 [54-1 USTC ¶ 9299↩].