H. Allen Smith and Verona H. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 52149.
United States Tax Court
T.C. Memo 1957-171; 1957 Tax Ct. Memo LEXIS 80; 16 T.C.M. (CCH) 755; T.C.M. (RIA) 57171; September 9, 1957
*80 The principal petitioner was sole proprietor of a wholesale seafood business at Oyster, Virginia; and he also was a member of several joint ventures in the vicinity, some of which engaged in planting and harvesting oysters, and others of which engaged in processing such oysters for the market. All oysters harvested or processed by the related business were marketed by the proprietorship; and the joint ventures were credited with the full market prices received. Memoranda of the various inter-business transactions were kept at the proprietorship; but the profits of such joint ventures were not reflected on the ledgers of the proprietorship, and therefore were not reported on the returns which were prepared from such ledgers. After the inadequacy of petitioner's accounting methods was brought to his attention by a revenue agent, he employed accountants to assist him; and thereafter petitioner and these accountants worked with the respondent's agents in reconstructing the correct income for all years involved by the "net worth" method. The result was that the parties agreed upon the amounts of the deficiencies for all years involved. Held, that none of petitioner's returns for the *81 years 1942 through 1946 was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code; and that assessment for each of the years 1942 through 1944 is barred by the statute of limitations. Held, further, that, as regards each of the years 1945 and 1946, petitioners omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return; and accordingly that, under section 275(c) of the 1939 Code, assessment for each of said years is not barred by the statute of limitations. There is no dispute that assessments for 1948 and 1949 are not barred by limitation. Held, further, that no part of the deficiency for any of the years 1942 through 1946 was due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. As regards the years 1948 and 1949, no addition to tax under said section was determined. Lester I. Bowman, Esq., Union Trust Building, Petersburg, Va., for the petitioners. James A. Scott, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined the following deficiencies, additions to tax and overassessment, in respect of income taxes of the petitioners: Over-
assess-
Addition to Tax
Year
Deficiency
ment
under Sec. 293(b)
1942
$ 1,089.82
$ 544.91
1943
21,629.39
10,814.70
1944
61,827.91
30,913.96
1945
21,170.59
11,651.40
1946
5,712.26
2,856.13
1947
$2,242.81
1948
529.88
1949
1,785.04
At the trial, the parties stipulated that the correct amounts of the deficiencies for the years involved are as follows: Year
Deficiency
1942
$ 332.97
1943
17,271.01
1944
50,632.34
1945
22,724.80
1946
7,609.96
1948
127.14
1949
889.62 Respondent asserted claim for the increased *83 deficiencies for 1945 and 1946. Also, petitioners conceded that assessment of the agreed deficiencies for the years 1948 and 1949 is not barred by the statute of limitations, and may be made immediately. The issues for decision are: (1) Whether assessment of the deficiency for each of the years 1942 through 1946 is barred by the statute of limitations. The determination of this issue requires answers to the following questions: (a) Was the return for each of said years false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code? (b) In any event as regards each of the years 1945 and 1946, did the petitioners omit from gross income for each of said years an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, within the meaning of section 275(c) of the 1939 Code? (2) Whether additions to tax under section 293(b) should be imposed for each of the years 1942 through 1946. Findings of Fact Some of the facts have been stipulated. The stipulation, together with the exhibits made a part thereof, is incorporated herein by reference. The petitioners are husband and wife, *84 and are residents of Cheriton, Virginia. They filed a joint income tax return for each of the years 1942 through 1946, and also for each of the years 1948 and 1949, with the then collector of internal revenue for the district of Virginia. Petitioner, H. Allen Smith (hereinafter called the "petitioner") was 47 years of age at the time of the hearing. He had a high school education; and he also had spent 9 months in business school, where he took courses in business arithmetic and bookkeeping. After leaving school, he worked for a time in his father's retail seafood business. In 1931 petitioner established, as a sole proprietor, a wholesale seafood business at Oyster, Virginia. He operated said business during all of the years here involved; and during the busy season of some of those years, he employed approximately 90 people. In the operation of such business, he purchased oyster shell stock from watermen, removed the meat from the shells, canned the meat, and sold the final product to customers. Also, he purchased fish from watermen, and after 1946 he operated some fishing boats. In addition to this proprietorship in Oyster, Virginia, petitioner had interests in several separate *85 joint ventures that operated in the vicinity, some of which planted and harvested oysters, and others of which processed and canned these oysters for the market. The oyster-processing joint ventures, in which he had interests at one time or another during the years involved, included the following: At Chincoteague, Virginia - a one-half interest in an oyster-processing house with Eugene Jester. At Chincoteague, Virginia - a one-fourth interest in an oyster-processing house with T. W. Hamilton, Charlie Morris and Forrest Daisey. At Smith Island, Maryland - a one-third interest in an oyster-processing house with Calvin Bradshaw and Harvey Bradshaw. At Oxford, Maryland - a one-half interest in an oyster-processing house with a Mr. Jones. At Willis Wharf, Virginia - a one-half interest in an oyster-processing house with an unnamed person. The evidence does not disclose the number, location or membership of the several oyster-planting joint ventures in which petitioner had an interest. Upon commencement of his operations in 1931, petitioner set up a simple set of accounting records which he maintained personally. During World War II his business increased, and he then employed *86 two local girls to assist him in maintaining his records and office. Qualified bookkeepers were scarce in the area; Oyster had a population of only about 125 to 150 people, and Cheriton which was situated 3 or 4 miles from Oyster had a population of only about 750 people. One of the girls so employed was Mary Parsons, whose bookkeeping education was limited to one year in high school; and her term of employment was from September 1943 to June 1945. The other girl was Virginia Bell Riggin, who was employed from November 1944 to November 1949; she had a high school education and one year of college, but had taken no bookkeeping courses whatever. These two girls acted efficiently in making the entries in the office ledgers, but they were not expert bookkeepers. Petitioner taught them how to keep the records; and Virginia Riggin was instructed also, during her first year by Mary Parsons. The records maintained for petitioner's proprietorship in Oyster, Virginia, included accounts receivable from sales made to customers; accounts of expenditures for oysters and fish purchased and for ice, boxes, barrels, and other miscellaneous supplies; records of oyster processing; and memoranda of *87 transactions had with the joint ventures in which petitioner was interested. Purchases of seafood at the proprietorship were handled in the following manner: Oysters and fish were usually purchased with cash. Most of the watermen from whom such purchases were made had only a very limited education, and preferred cash; and it was the custom in the locality, to so pay them. Furthermore, there was no bank in the vicinity where checks could be cashed. The watermen were paid either by petitioner or by one of his girl employees, from funds kept in the office that were obtained from a bank account that petitioner maintained in Cape Charles, Virginia. Purchases of oysters and fish were entered immediately on daily purchase sheets; and a notation was made thereon if the payment had been made by check instead of cash. These purchases were thereafter posted in a ledger at weekly intervals, or whenever convenient. Such posting was usually done by one of the girls, but occasionally may have been done by petitioner. Labor, like seafood purchases, was usually paid for with cash; but all other expenses were paid by check. These items also were posted periodically, according to classification. *88 Petitioner's sales of seafood to customers were mostly on credit. They were reflected on sales invoices and shipping orders, which were made daily; and they also were entered daily in a separate ledger. As regards the several planting joint ventures, petitioner supplied all the seed oysters to the participating watermen; and they located the planting grounds, planted the oysters, cared for them during the growing period, and harvested them. The planting joint ventures were free to sell the harvested oysters to whomever they chose; but in practice they always sold to petitioner's processing joint ventures at the current market prices. As regards the processing joint ventures, they from time to time advised petitioner of the amounts of money needed for their miscellaneous overhead expenditures, and also for the purchase of shell oysters from the planting joint ventures; and petitioner then drew a check on his bank account in Cape Charles, and forwarded it to the particular processing joint venture. Such advancements were deposited by the processing joint venture in a bank account entitled "H. Allen Smith," on which the manager of the processing venture had a power-of-attorney *89 to draw checks. From such account, the manager paid the operating expenses; and also, upon the purchase of harvested oysters from a planting joint venture, he deposited the amount of the purchase price in a separate bank account entitled "H. Allen Smith, Special," for future division among the members of such planting joint ventures. Memoranda of all transactions between the several joint ventures, and between them and the proprietorship were kept at the proprietorship in Oyster; and at the end of the planting harvest, the profits of the planting joint ventures were divided. The processing joint ventures shucked the oysters, packed them, and advised petitioner of the amount of canned oysters they had available for sale; and they then shipped the same according to petitioner's orders. Petitioner alone had authority to direct shipment of the canned oysters from the processing joint ventures to customers. When he directed such a shipment to a customer, he paid the processing joint venture the same price that he received from the customer. Such amount was reflected on an invoice to the customer; was entered on the proprietorship books at Oyster as an account receivable; and also was *90 treated on these books as a purchase from the processing joint venture. Any advancement which petitioner had previously made to the processing joint venture, as above mentioned, was credited against the purchase. The profit on each such transaction was actually derived by the processing joint venture, and not by the proprietorship, because of the joint venture's sale to the latter at the same price which the proprietorship charged to the customer. The purpose of this type of accounting was to permit a simple computation of profits to be presented to the other joint venturers, who had only limited education. The income tax returns of petitioner and his wife, for the years 1942 through 1948, were prepared in the following manner: The girl employees in petitioner's office at Oyster made totals on adding machine tapes of the sales and expenses of the proprietorship at Oyster; itemized the expenses on separate summary sheets; and turned over such tapes and summary sheets to petitioner. Petitioner then submitted the summary sheets and the totals of the adding machine tapes, to an attorney in Cape Charles, Virginia, who prepared the returns therefrom. None of the data submitted to the attorney *91 reflected any of petitioner's shares of income in the several joint ventures. Such income was reflected in the informal memoranda of the venture transactions, but was not reflected on the books of the proprietorship; and accordingly none of such joint venture income was reported on the returns for the years 1942 through 1946 that were prepared from data obtained from such proprietorship books. In 1949 an internal revenue agent, who had contacted the petitioner with reference to his business records and income, suggested that petitioner should retain a certified public accountant. Petitioner did this; and his 1949 return was prepared by the accounting firm of Frederick B. Hill and Company, Norfolk, Virginia. The books and records of the petitioner were incomplete and inadequate to reflect his entire income for any of the years 1942 to 1949, inclusive. Some of the records had been destroyed in a flood at Oyster in 1947; and some canceled checks had been destroyed inadvertently by one of the joint venturers, or had been lost through normal circumstances during the course of time. None of the records showed the amounts of petitioner's distributive shares of the joint venture incomes. *92 The records did, however, show the amounts which petitioner owed to other persons, and the amounts which other persons owed to him; and they also reflected all sales by the proprietorship of oysters acquired either from the several joint ventures or otherwise. Because of the inadequacy of petitioner's records, respondent reconstructed petitioner's income for the years 1942 through 1949 by use of the so-called "net worth" method; and the deficiencies set forth in the notice of deficiency were determined by use of such method. Subsequently, and prior to the trial, the parties agreed upon a revised "net worth" computation. This, together with a statement of the amounts of adjusted gross income and net income reported on the returns, is as follows: ASSETS
12/31/41
12/31/42
12/31/43
12/31/44
Cash on hand and in banks
$ 3,370.68
$ 1,556.21
$19,772.56
$ 43,292.15
Accounts receivable
11,783.82
8,317.08
16,534.26
34,836.40
Inventories
1,200.00
1,200.00
4,000.00
4,786.50
Loans and advances
3,950.00
U.S. Savings Bonds
300.00
543.75
975.00
2,625.00
Land and buildings
12,600.00
18,250.00
21,550.00
44,229.82
Equipment
2,700.00
4,200.00
5,000.00
8,074.00
Prepaid expenses
Total Assets
$31,954.50
$34,067.04
$67,831.82
$141,793.87
LIABILITIES
Notes payable
$ 800.00
Accounts payable
Allowance for
1,076.88
$ 2,095.63
$ 3,486.88
$ 5,841.36
depreciation
Total Liabilities
$ 1,876.88
$ 2,095.63
$ 3,486.88
$ 5,841.36
Net worth at end of year
$30,077.62
$31,971.41
$64,344.94
$135,952.51
Net worth at beginning of
30,077.62
31,971.41
64,344.94
year
Increase in net worth
$ 1,893.79
$32,373.53
$ 71,607.57
Add: Personal
4,084.85
6,223.82
15,911.03
expenditures and other
allowable deductions
Total
$ 5,978.64
$38,597.35
$ 87,518.60
Less: Inherited property
3,000.00
Nontaxable portion of
capital gain
Adjusted gross income
$ 5,978.64
$38,597.35
$ 84,518.60
Less: Non-business
227.00
327.00
1,895.44
deductions
Correct net income
$ 5,751.64
$38,270.35
$ 82,623.16
Less: Net operating loss
deduction
Net income for 1945 as
adjusted by carryback
Adjusted gross income
$ 4,470.95
$ 5,556.39
$ 12,786.78
reported on returns
Net income reported on
$ 4,243.95
$ 5,229.39
$ 10,891.34
returns
*93 ASSETS
12/31/45
12/31/46
12/31/47
Cash on hand and in banks
$ 53,583.31
$ 32,751.72
$ 13,743.91
Accounts receivable
32,277.25
33,926.51
48,201.04
Inventories
5,000.00
5,500.00
5,600.00
Loans and advances
10,707.57
9,966.40
17,801.26
U.S. Savings Bonds
13,268.75
13,268.75
1,518.75
Land and buildings
51,879.82
72,143.30
68,973.42
Equipment
12,819.00
15,869.04
27,356.59
Prepaid expenses
5.48
443.99
763.01
Total Assets
$179,541.18
$183,869.71
$183,957.98
LIABILITIES
Notes payable
$ 15,000.00
Accounts payable
$ 3,500.00
$ 8,443.24
4,519.35
Allowance for
9,425.63
14,204.65
19,394.81
depreciation
Total Liabilities
$ 12,925.63
$ 22,647.89
$ 38,914.16
Net worth at end of year
$166,615.55
$161,211.82
$145,043.82
Net worth at beginning of
135,952.51
166,615.55
161,221.82
year
Increase in net worth
$ 30,663.04
($ 5,393.73)
($ 16,178.00)
Add: Personal
28,102.20
34,227.94
11,789.18
expenditures and other
allowable deductions
Total
$ 58,765.24
$ 28,834.21
($ 4,388.82)
Less: Inherited property
Nontaxable portion of
capital gain
Adjusted gross income
$ 58,765.24
$ 28,834.21
($ 4,388.82)
Less: Non-business
2,100.00
1,200.00
deductions
Correct net income
$ 56,665.24
$ 27,634.21
($ 4,388.82)
Less: Net operating loss
4,388.82
deduction
Net income for 1945 as
$ 52,276.42
adjusted by carryback
Adjusted gross income
$ 20,095.02
$ 12,828.49
reported on returns
Net income reported on
$ 17,995.02
$ 11,628.49
$ 11,178.97
returns
*94 ASSETS
12/31/48
12/31/49
Cash on hand and in banks
$ 6,481.23
$ 12,009.82
Accounts receivable
43,633.19
56,734.51
Inventories
5,400.00
5,400.00
Loans and advances
25,428.00
24,448.49
U.S. Savings Bonds
1,518.75
1,518.75
Land and buildings
75,143.69
86,252.53
Equipment
31,876.04
45,585.01
Prepaid expenses
603.27
1,970.69
Total Assets
$190,084.17
$233,919.80
LIABILITIES
Notes payable
$ 15,000.00
$ 42,487.00
Accounts payable
4,020.51
13,857.42
Allowance for
27,329.30
33,292.62
depreciation
Total Liabilities
$ 46,349.81
$ 89,637.04
Net worth at end of year
$143,734.36
$144,282.76
Net worth at beginning of
145,043.82
143,734.36
year
Increase in net worth
($ 1,309.46)
$ 548.40
Add: Personal
15,425.63
11,969.35
expenditures and other
allowable deductions
Total
$ 14,116.17
$ 12,517.75
Less: Inherited property
Nontaxable portion of
1,255.90
capital gain
Adjusted gross income
$ 14,116.17
$ 11,261.85
Less: Non-business
1,000.00
1,284.78
deductions
Correct net income
$ 13,116.17
$ 9,977.07
Less: Net operating loss
deduction
Net income for 1945 as
adjusted by carryback
Adjusted gross income
$ 13,560.44
$ 6,397.68
reported on returns
Net income reported on
$ 12,560.44
$ 5,112.90
returns
*95 All understatements of income on the returns for the years 1942 through 1946 were due to the omission from the returns of petitioner's distributive shares of profits of the several joint ventures in which he had an interest, and not to any adjustment of the deductions or cost of goods shown on the returns. In 1949, as above stated, petitioner retained the accounting firm of Frederick B. Hill and Company to assist him. These accountants experienced difficulty in devising a revised system of accounting for the proprietorship and joint ventures which was non-technical enough to be practicable; and they failed to discover the precise reason for the understatements of income on the returns, until after they had heard petitioner testify at the trial regarding his method of accounting between the proprietorship and the joint ventures. As of the beginning of the year 1949, these accountants converted petitioner's books from a calendar year basis to a fiscal year basis; and they also placed the joint ventures on an inventory basis. Both petitioner and his accountants cooperated fully with respondent and his agents in their investigation of his accounts; made available to respondent all *96 records in their possession; and exchanged information and computations with respondent's agents, in an attempt to arrive at the correct income for each of the years involved. This resulted in the revised deficiencies which have been agreed upon. Petitioner's reputation for honesty and integrity in the communities in which he resides and did business was excellent. He, from time to time, borrowed money from the Northampton County Bank & Trust Company of Cape Charles, Virginia; and was regarded by that bank to be one of its most valued customers. No part of the deficiency for any of the years 1942 through 1946 was due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code; and none of the returns for said years was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of such Code. For each of the years 1945 and 1946, petitioners omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the gross income stated on the return, within the meaning of section 275(c) of the 1939 Code. The parties have agreed that, by reason of the execution of certain consents or waivers, assessments *97 for such years are not barred by limitation if section 275(c) is applicable. Opinion I The first issue for consideration is whether assessment of the agreed deficiencies for the years 1942 through 1946 is barred by limitation under the applicable provisions of the 1939 Code. [1] Respondent contends as to this issue: (1) That, as to all of said years, assessment is not barred by limitation on the ground that the return for each of these years was false or fraudulent with intent to evade tax, within the meaning of section 276(a); and (2) that, in any case as to the years 1945 and 1946, assessment is not barred, on the further ground that for each of these years petitioner omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, within the meaning of section 275(c). *98 As regards the first of these contentions which involves an allegation of fraud, it is to be observed at the outset that the burden of proving fraud is on the respondent. Section 1112, 1939 Code. The law is well settled that fraud is never presumed; that there is no presumption of correctness attaching to any determination of fraud made by the Commissioner; and that an issue of fraud should be decided on the weight of the evidence. Henry S. Kerbaugh, 29 B.T.A. 1014. Here the respondent has relied principally, to carry such burden, upon the substantial amounts of the agreed understatements of net income, computed through use of the so-called net worth plus nondeductible personal expenditures method. By stipulation, the computations of net worth which the respondent used in determining the deficiencies set forth in his notice of deficiency were revised prior to the trial - with the result that the amounts of the deficiencies for each of the years 1942, 1943, 1944, 1948 and 1949, as now agreed upon, are less than those which the respondent determined; and that those for the years 1945 and 1946 are greater than those determined in the deficiency notice. As regards the *99 year 1947, the respondent determined that the tax had been overassessed, and accordingly that year is not before us. However, the evidence discloses that there was reported on the 1947 return, net income of $11,178.97; and it has been stipulated that there was no net income but rather a loss of $4,388.82, so that there was an overreporting of net income for said year in the amount of $15,567.79. In Holland v. United States, 348 U.S. 121, 139, the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records" would warrant a determination by the fact-finder [in that case a jury], "that these acts supported an inference of willfulness." See also Epstein v. United States, 246 Fed. (2d) 563 (C.A. 6, July 2, 1957); Schwartskoff v. Commissioner, 246 Fed. (2d) 731 (C.A. 3, July 10, 1957). But the Supreme Court further pointed out in the Holland case, at page 128, that "an inference of willfulness from net worth increases alone might be unjustified, especially where the circumstances surrounding the deficiency *100 are as consistent with innocent mistake as with willful violation." In the instant case, we are convinced from our analysis of the entire evidence that the understatements of income here involved did result from innocent mistake, from inadequate accounting methods employed for a related group of business organizations which included both a proprietorship and several separate joint ventures, and from failure of petitioner to understand and apply the requirements of the statute regarding the reporting of distributive shares of joint venture income [2] - and not from any willful attempt or intention of the petitioner "to defeat the statute or evade tax." See Fred N. Acker, 26 T.C. 107. The situation here presented, as set forth in our Findings of Fact, is in brief as follows: The petitioner operated, as a sole proprietor, a wholesale seafood business at Oyster, Virginia; *101 and, at the same time, he was a member of several separate joint ventures with other persons, some of which planted and harvested oysters, and others of which processed the shell oysters acquired from the planting joint ventures. Petitioner furnished all the seed oysters planted by the first group of joint venturers; and he also advanced to the processing joint venturers, from the bank account of his proprietorship, such funds as they required for labor and miscellaneous operating expenses and also for their purchase of shell stock from the plating joint ventures. The amounts so advanced to a processing venture were deposited in a separate bank account, entitled "H. Allen Smith" (the name of the petitioner), on which the manager of the venture was authorized to, and did, draw checks for the above-mentioned purposes. Also petitioner caused another bank account to be created under his name, as "H. Allen Smith, Special," in which the processing venture deposited the amounts credited to a planting joint venture as the purchase price of its harvested shell oysters. All processed oysters produced by the several processing joint ventures, and also all of those processed by the proprietorship *102 in Oyster, were marketed by petitioner through his proprietorship. The method of accounting employed for the transactions of the proprietorship, and also for the transactions between the proprietorship and the several joint ventures, was one which petitioner himself devised without expert accounting assistance. Because the other members of the joint ventures had only limited education and no knowledge of accounting, the prices credited to planting ventures by the processing ventures were the current market prices of the shell stock purchased; and the prices credited to the processing ventures by the proprietorship were the same amounts for which such product was sold by the proprietorship to customers. Memoranda of all the inter-business transactions were maintained at the proprietorship but the ledgers of the proprietorship from which the returns were prepared, did not themselves reflect the above-mentioned inter-business transactions. These ledgers reflected only the sales prices for all processed oysters and fish sold by the proprietorship (including the sales prices of the oysters obtained through the several joint ventures), the costs to the proprietorship of all its seafood *103 (including the amounts which it credited to the processing joint ventures for oysters purchased from them), and the miscellaneous costs of the proprietorship alone. The result was that the income reflected on the proprietorship books and reported on the returns, which were based on such books, did not include any of petitioner's distributive shares of profits of the several joint ventures. In 1949, after the inadequacy of petitioner's accounting methods was brought to his attention by one of respondent's revenue agents, he retained the services of a firm of accountants to assist him. Thereafter both he and these accountants cooperated fully with the revenue agents in an effort to reconstruct his correct net income for all years, by use of the net worth method; and the result was, as before stated, that the correct amounts of the net income for all years, and also the correct amounts of the deficiencies for all years, were agreed upon. In reaching our conclusion as to the absence of fraud with intent to evade tax, we have been impressed by the facts that the amounts of all sales to customers, together with all costs to the proprietorship, of oysters which had been planted and processed *104 by any of the several interrelated businesses and also of those which the proprietorship acquired from other parties, were taken into account and reported on the returns; that the separate bank accounts established for use in the joint venture transactions were maintained in the name of petitioner, as the "H. Allen Smith" account and the "H. Allen Smith, Special" account, which indicates an attempt to segregate and earmark the funds therein; that memoranda of all the inter-business transactions were maintained at the proprietorship office, even though petitioner's distributive shares of the joint venture incomes resulting from such transactions were not reflected in the ledgers from which the returns were prepared; and that the accounting method which petitioner employed did not result in a consistent pattern of understated income for all years, but also resulted in a substantial overreporting of income for the year 1947. We have been impressed also by the frankness and demeanor of all petitioner's witnesses, including himself, the two girls employed in his office, and the accountant who worked with him and the respondent's agents in ascertaining the agreed amounts of the net income *105 and deficiencies. We regard all of this testimony to be credible, including the following statements made by the petitioner in response to questioning by the Court: "It has never been my contention, Your Honor, that the monies didn't come from income. If I understand correctly, I am being tried for willfully defrauding; that I intentionally tried to defraud the Government. From my standpoint I am a layman. I am not acquainted with CPA knowledge that is necessary to enter those computations. I am not a lawyer. I did the very best I knew how, and I done wrong. And I am being tried for intentionally defrauding, and I didn't intentionally defraud the Government. I made a mistake and that is how it is. * * *
"Your Honor, the only figures that were wrong, that were given to Mr. Ayres then [the attorney who prepared the returns from data which petitioner submitted to him], and they didn't come to light until just recently, was all profits made by the joint ventures that I had at other places. I bought the product from them at my selling price. Unconsciously, profits stayed in those different banks at all times. It never entered into my mind. All I had was the accounts receivable, *106 the correct accounts receivable; and later on during the year at selling time the profits from these ventures were put into my bank account, and they, never being entered into a record of any kind, never got into my income tax return. That only come to light just recently." We hold that none of the returns here involved was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code; and accordingly that assessment for each of the years 1942 through 1944 is barred by the applicable statute of limitation. II We shall next consider the alternative contention of respondent that, in any event as regards the years 1945 and 1946, assessment for such years is not barred by limitation on the ground that petitioners omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, within the meaning of section 275(c). We decide this issue in favor of the respondent. The agreed understatements of income represent omissions by the petitioner from the returns, of his shares of the incomes of the several joint ventures in which he had an interest; and such shares were *107 properly includible in his gross income. Although these shares were of the net incomes of the joint ventures, it is obvious that, since net income is a part of gross income, his shares of the joint venture gross incomes must have been of at least equal or greater amounts. The omission of joint venture net income for each of the years 1945 and 1946 was in excess of 25 per cent of the amount of gross income stated in the return; and it therefore is unnecessary for us to decide here the problem of whether the amounts properly includible in petitioner's gross income from such ventures are his shares of the net incomes or of the gross incomes of such ventures. See Revenue Ruling 55-415, 1955-1 C.B. 416 [412]; and Jack Rose, 24 T.C. 755, 768-9. H. A. Hurley, 22 T.C. 1256, affirmed on other grounds 233 Fed. (2d) 177 (C.A. 6), upon which the petitioners place principal reliance, is distinguishable and not here applicable. In that case we held that proof of additional net income by the net worth method did not necessarily establish an omission of gross income, because such additional net income might there have resulted from an overstatement *108 of deductions. In the instant case, however, the additional net income resulted solely from omissions of joint venture income. Therefore, the problem suggested in Hurley, supra, is not here present. We hold that the provisions of section 275(c) are here applicable; and that assessment for each of the years 1945 and 1946 is not barred by limitation. III For the reasons above expressed in relation to section 276(a) of the Code, we here further hold that no part of the deficiency for any of the years 1942 through 1946 is due to fraud with intent to evade tax, within the meaning of section 293(b). Moreover, as regards the years 1942 through 1944, we have held that assessments for such years are barred by limitation, and this bar applies also to additions to tax. As regards the years 1948 and 1949, no additions to tax were determined by respondent; and the petitioners have stipulated, as above shown, that the assessments for such years are not barred by limitation, and may be made immediately. Decision will be entered under Rule 50. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
2. Section 3797(a) of the 1939 Code in effect classifies joint ventures as partnerships for income tax purposes. And section 182 of the Code requires a taxpayer to include in his net income his distributive share, whether distributed or not, of the net income of each partnership of which he was a member.↩