**UNITED STATES of America, Appellee,**

v.

**Marion STONE, Appellant.**

**No. 75–1366.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 9, 1975.

Decided March 23, 1976.

Rehearing Denied April 13, 1976.

Joseph S. Friedberg, Minneapolis, Minn., Jack S. Nordby, St. Paul, Minn., for appellant.

Donald F. Paar, Asst. U. S. Atty., Robert G. Renner, U. S. Atty., Minneapolis, Minn., for appellee.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

The United States indicted appellant-Marion N. Stone for willfully filing fraudulent tax returns for calendar years 1968 (count I) and 1969 (count II). A jury found Stone guilty on both counts and the district court imposed a general sentence of imprisonment for a period of three years with 33 months suspended. The district court also imposed a fine of $10,000, and provided as a condition of probation that Stone should actively cooperate with the United States in the settlement of his civil tax liabilities. Stone brings this appeal and we affirm the conviction.

Stone's business enterprises included a recreational parlour known as the "Celebrity Lounge," the operation of a used car business known as "Stone's Auto Mart," and the sale and rental of real estate properties. Since Stone had not kept adequate records of his business transactions for the years in question nor for prior years,[1] the Government proceeded to prove its case by the net worth method. Stone had reported his taxable income for the year 1968 at $12,951. The Government calculated that his net worth had increased in that year over $25,000, and that his corrected taxable income amounted to $30,243. For the calendar year 1969, Stone reported income of $14,390, but the Government calculated a net worth increase of more than $42,000 in 1969, and computed Stone's taxable income at $51,910. The Government determined that Stone understated his income for the year 1968 by $17,292 and for the year 1969 by $37,519.

Stone seeks to overturn his conviction on the following grounds:

1) that the evidence was insufficient to sustain the conviction under the net worth method because the opening net worth statement for the calendar years involved failed to include a number of used automobiles in the inventory of Stone's Auto Mart;

2) that the evidence was insufficient to prove a willful violation of 26 U.S.C. § 7201; and

3) that the trial court committed prejudicial error in permitting an Internal Revenue Service agent to testify that Stone's 1958 and 1959 tax returns had been referred to the Intelligence Division of the Internal Revenue Service for possible fraud prosecution.

We examine these contentions.

I. *Net Worth Calculation.*

■ In utilizing the "net worth" method of proof to establish Stone's tax evasion, the Government included in Stone's opening net worth for calendar year 1968 the sum of approximately $8,000, representing Stone's inventory of used cars on hand at his "Auto Mart." This calculation was based on Stone's statement in 1972 to an Internal Revenue Service agent that the only cars he had in inventory at the end of years 1967, 1968, and 1969, were cars that were "floor planned."[2] Stone told the Internal Revenue Service personnel that during the course of his business he had obtained automobile loans from Industrial Credit, Liberty State Bank, Commercial State Bank, and Gambles Continental State Bank. After following these leads, the Internal Revenue determined that at the end of 1967, eight cars had been floor planned with Industrial Credit and that the value of this inventory

---

1. The evidence disclosed that Stone's problems with the Internal Revenue Service began in 1960 when his 1958 and 1959 federal tax returns were audited. The audit showed substantial tax deficiencies for both years.

   In 1965, the Internal Revenue Service audited Stone's 1962 tax return and determined that discrepancies existed. During these years,

Stone did not maintain adequate records and the Government was required to resort to the net worth method to ascertain Stone's taxable income.

2. In this case, the "floor planned" or financed vehicles were those in inventory by reason of repossessions from defaulting purchasers.

to Stone amounted to approximately $8,000. That inventory figure was verified by testimony of a witness formerly employed by Industrial Credit, who identified records establishing a physical count and value of the floor-planned vehicles on December 28, 1967. The Government checked with other finance companies but was unable to locate any additional floor plans for 1967–69. Accordingly, the Government used the approximate $8,000 inventory figure of the Industrial Credit floor plan as the opening automobile inventory of Stone's Auto Mart for calendar year 1968. As noted, this figure was based on Stone's own statement that all of his cars at year end were floor planned and the fact that the Government could only locate the Industrial Credit floor plan. This $8,000 calculation with other items not in question made up the opening net worth of the taxpayer for 1968, which totalled approximately $67,000.

Stone did not testify at the trial. However, he produced evidence from other witnesses, who stated that they saw more than the eight floor-planned automobiles at Stone's Auto Mart warehouse. In particular, Leroy Brills, a former employee of Industrial Credit and the person who counted the automobiles floor-planned to Industrial Credit, testified that on December 28, 1967, he verified the eight automobiles financed to Industrial Credit and recalled seeing 30 or more additional cars in the automobile warehouse. He did not know, however, whether Stone actually owned those additional automobiles. Other witnesses testified that there were many more than eight cars at the warehouse; however, no one knew who owned the cars.[3]

In considering the appellant's contention that the evidence was insufficient to sustain a conviction on the net worth method of calculating taxpayer's income, we are mindful of the Supreme Court's admonition in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), that the Government is required to establish "with

reasonable certainty, * * * an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets [and that] * * * the correctness of the result depends entirely upon the inclusion in this [net worth] sum of all assets on hand at the outset." *Id.* at 132, 75 S.Ct. at 134, 99 L.Ed. at 163.

The *Holland* court also noted the duty of the Government to investigate leads furnished by the taxpayer:

When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. [*Id.* at 135–36, 75 S.Ct. at 135, 99 L.Ed. at 164.]

Here, Stone did not furnish the Government with any records of an actual automobile inventory. The Government reconstructed this inventory based upon the best information available. Stone indicated that all of his inventory was floor planned and he did not inform the Government of any other floor plans besides the Industrial Credit plan. Stone at the trial produced some evidence showing the physical presence of other vehicles in the automobile warehouse, but no evidence that Stone himself owned those vehicles. The record shows that the Government had sought information on these other cars. It checked other finance companies in search of other floor plans and attempted to check Minnesota state records to ascertain automobiles owned by Stone. As the *Holland* Court noted:

[W]here relevant leads [from the taxpayer] are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter

---

**3.** The Internal Revenue attempted to ascertain Stone's ownership of the automobiles through Minnesota state records, but these records had

been destroyed. Stone disclosed no ownership records for additional automobiles.

peculiarly within the knowledge of the defendant. [*Id.* at 138–39, 75 S.Ct. at 137, 99 L.Ed. at 166.]

■ Once the Government establishes the opening net worth with "reasonable certainty," as was the case here, defendant-Stone, who remained silent, did so at his peril. *Id.* Accordingly, we reject the taxpayer's contention that the prosecution failed to establish an opening net worth with "reasonable certainty."

## II. *Willfulness.*

■ Stone contends that the evidence was insufficient to show willfulness. We disagree. Stone's returns had been audited twice before the audit and prosecution in this case. He was well aware of his obligation to keep adequate records concerning his income. In statements to IRS agents, Stone admitted that he kept most of his records in his head. There was evidence that some of his records had been accidentally destroyed in 1967, but no adequate explanation of his failure to keep adequate records for subsequent years, including the years here in question. Indeed, an IRS agent related that Stone told him in 1972 that "his car business was a mess and that he could not keep records and only he and God could figure out what the status of his car business was." The Government produced adequate evidence of Stone's willful failure to account for his income during the years here in question. The issue of willfulness properly went to the jury.

## III. *Evidence Properly Admitted.*

Agent Robert J. Hanson of the IRS testified over objection that in auditing Stone's earlier returns for the calendar years 1958 and 1959, he referred Stone's case to the Intelligence Division as a potential fraud case.

The dialogue between court and counsel indicated that the court admitted that evidence solely to show that the investigation that year had been referred to the division of the Internal Revenue Service which has responsibility for investigating fraud cases.

Subsequently in the course of the trial the Government called Revenue Agent Howard G. Lorch, who testified that he worked with an Intelligence agent in the further investigation of Mr. Stone's 1958 and 1959 tax returns. An audit report was prepared in which the taxpayer agreed with the findings of the Internal Revenue agents that Stone owed additional income taxes.

The record reveals that the answer by Agent Hanson to the objected-to question was preliminary and furnished a foundation for introduction of evidence of the subsequent formal audit made of the taxpayer's 1958 and 1959 tax liabilities. Agent Lorch made clear on cross-examination that the Intelligence Division withdrew from the case and that no criminal liability ever attached to the taxpayer's reporting of his 1958 and 1959 tax liability.

■ Under the circumstances, if there were error in a revenue agent mentioning that the 1958 and 1959 returns had been referred to the Intelligence Division as a potential fraud case, that error cannot be deemed prejudicial in the context of the explanation furnished by the next witness.

Finding no prejudicial error in the proceedings, we affirm the conviction.