**O. E. STEPHENS and Grace Stephens, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 5714.

United States Court of Appeals
Tenth Circuit.

April 4, 1958.

1. Blood v. City of New York, 2 Cir., 237 F.2d 855.

James M. Nelsen and Don D. Bowman, Denver, Colo., for petitioners.

C. Guy Tadlock, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz and Fred E. Youngman, Attorneys, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This appeal challenges deficiencies in income tax, and additions for fraud and substantial underestimation of taxes, assessed by the Commissioner against appellants and redetermined by the Tax Court on petition for review. The years in question are 1949, 1950 and 1951. The Tax Court found that for each year in question taxpayers owed substantial additional sums of income taxes; that they were guilty of fraud; and that there was a substantial underestimation of tax for each year in question. Fraud penalties were added and an additional amount was added for underestimation of tax under Section 294(d) (2) of the Internal Revenue Code of 1939, 26 U.S.C. A. § 294(d) (2). The Commissioner employed the net worth method in determining the amount of income on the ground that the books and records kept by taxpayers were inadequate and unreliable and that the net income could not be determined therefrom.

A number of assignments of error are urged for reversal of the Tax Court's determination. The main attack is levied against the employment of the net worth method of computing income. It is contended that taxpayers' books were adequate to determine income and, therefore, it was error to employ the net worth method. No discussion of the net worth method of computing income will be undertaken. The Supreme Court dealt exhaustively with this matter in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 133, 99 L.Ed. 150. It specificially approved this method of computing income. It carefully spelled out the conditions which must exist to warrant the use of this method and the burden resting upon the Government in employing it. The only question before us is whether this is a proper case for the use of that method. Appellants contend that it is not, because their books and records are adequate to determine income.

■■ The Commissioner is not precluded from using the net worth method by the mere fact that a taxpayer's books are consistent with his income tax return, nor by the fact that there are no inconsistencies, contradictions or ambiguities therein. In the Holland case the Court said, "Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage." And, "Certainly Congress never intended to make § 41 [26 U.S.C.A. § 41] a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books." The test is whether the books reflect all income. If they fail to do this, they are inadequate and the Government may employ other proper means in determining taxable income.

A rather lengthy detailed statement of facts is necessary to determine whether the Commissioner was warranted in employing the net worth method in computing income. The Tax Court found these facts. The principal sources of income of appellants during the years in question were farming, installments

from sales of real estate in prior years, gambling operations, and the operations of a hotel and night club in Arkansas. Petitioner resided in Missouri until 1909 when he first went to Denver, Colorado, and worked as a bell hop. He went back to Missouri in 1913, where his principal occupation was gambling. He returned to Denver about 1926 and engaged in the occupations of farming and gambling. In the succeeding years through 1932, he operated a number of gambling establishments in the vicinity of Colorado Springs. Some of these were known as the Havana Club, the Benswinger House, the Star Ranch, the Willows Club, and the Los Angeles Club. In about 1933 petitioner opened a dining and gambling club, known as Blakeland, which he operated until 1936.

From 1934 to 1946, he bought and sold stocks and commodities through brokers in Denver and in Colorado Springs. He traded in various commodities such as lard, wheat, butter, soybeans, rye and corn, as well as in various stocks. These operations resulted in a profit of about $13,268.20. These accounts were closed out on July 7, 1943, at which time a check in the amount of $32,183.90 was delivered to him. After 1943 he traded in stocks in the name of his partner, Eddie Jordan. In 1946 he sold corn short, and due to a price freeze sustained a loss in the amount of $22,231.25.

In 1941 he purchased a property called the Stockade, consisting of some ten acres of land and a building which he used as a gambling house. The purchase price was $13,000, of which he paid $5,000 in cash at the time of purchase and the balance in cash in 1942.

In March, 1943, he purchased a property known as Wild Acre Ranch, or Wildacres, in Arapahoe County for $45,000, which he paid in cash. He sold the ranch in 1946 together with ranch furnishings, cattle and other personal property for which the purchaser paid $13,000 in cash, gave checks totalling $22,919.64, and executed a mortgage in petitioner's favor for $80,000. From 1947 to 1951 he received the following payments on this mortgage:

```
1947–$30,000 principal, interest  $    83.33
1948–  5,000 principal, interest   2,500.00
1949–  5,000 principal, interest   2,250.00
1950–  5,000 principal, interest   2,000.00
1951–  5,000 principal, interest   1,750.00
```

In April, 1944, petitioner and one Jordan acquired a property known as Wolhurst for $78,000, on which he and Jordan each paid $14,000 at the time of the purchase. He paid his part of the purchase price with cash he had on hand. They executed a deed of trust for $50,000 for the balance of the purchase price. It had on it a building which had been a residence but which was used as a gambling house. The property was also used by them for farming purposes and for keeping saddle horses. Petitioner sold his interest in Wolhurst to his co-owner in 1946 for $50,000 and was paid thereon $25,000 during 1947 and 1948, $10,000 in 1949 and $15,000 in 1950.

In January, 1947, petitioner was held up in his home and robbed of $50,500 in cash which he had in the house. This money was subsequently recovered, the petitioner paying $1,500 in cash to the sheriff's deputies and a fee in the amount of $3,500 in cash to the Attorney whom he had engaged. He turned over $15,000 of this money to his wife, Nell.

On July 5, 1947, petitioner borrowed $10,000 from H. H. Looges. On May 18, 1948, he borrowed an additional $10,000. He also borrowed $3,000 in cash from Looges some time prior to May 18, 1948. To secure these loans, he assigned to Looges the Ferguson deed of trust on Wild Acre Ranch. In November 1947,

he borrowed $10,000 from the First National Bank of Englewood, Colorado, which loan was renewed on March 15, 1948, June 3, 1948, September 4, 1948, and was paid in full February 5, 1949.

In 1947 petitioner became interested in the Midway Hotel in Baxter County, Arkansas, and in a night club in Marion County, Arkansas, known as Silver Star Night Club. The owner of the property, Ethridge, had difficulty in paying off his creditors. Petitioner loaned Ethridge $25,000, represented by a check in the amount of $15,000 and cash in the amount of $10,000. In January, 1948, he paid off additional debts outstanding against these properties and at that time Ethridge and his wife deeded these properties to petitioner. All the creditors were paid off except one Keys, who had furnished material for the hotel and night club. He received a mortgage from petitioner in the sum of $33,497.89 to secure his claims. Petitioner paid $5,000 on the mortgage in 1949, $17,500 in 1951, and $7,500 in 1952. The total cost of these Arkansas properties to petitioner was $71,590.24. He contemplated making large and substantial changes in these properties which local contractors estimated would cost from $100,000 to $200,000.

The hotel and night club were operated by and for petitioner through the year 1950. The venture did not prove profitable and in 1951 he contracted to sell these properties for $75,000. The purchaser agreed to make a $20,000 down payment which he failed to do. In lieu of a deposit of $3,000, he turned over in 1951 a Tucker automobile to petitioner for an agreed consideration of $3,000. Later the purchaser turned over to petitioner another Tucker automobile which had cost him about $2,000 at an auction in October, 1950. The purchaser took possession of these properties, operated them for a short time, then abandoned them and forfeited the two automobiles to petitioner.

Disappointed in the Arkansas venture, petitioner returned to Colorado to acquire more land to expand his operations there. In April, 1949, he contracted to purchase 80 acres of bottom land in Douglas and Jefferson Counties, known as the Dale property, for $4,250, for which he paid, at the time of the execution of the contract, $1,000 by check and $2,000 in cash. The balance of the purchase price he paid by check January 23, 1950. In January, 1950, he contracted to purchase about 40 acres in Douglas County, known as the Blakeland Farm, for $55,000. On January 15, 1950, he paid $7,000 in cash and shortly thereafter an additional $23,000 in cash. The vendor deeded the property and took back a deed of trust to secure the balance of the purchase price of $25,000. In March, 1951, petitioner acquired title to property in Douglas County, known as the Platte River Ranch, for $22,500, of which he paid $1,000 by check in 1950 and the balance of $21,500 in March, 1951, by cashier's check.

During the period of 1947 to 1951, he had bank accounts in the United States National Bank at Denver, the Littleton National Bank, Littleton, Colorado, and the First National Bank of Englewood, Colorado. He maintained a safe deposit box at the bank in Denver during the years 1947 to 1951 and also at the bank in Littleton during the year 1951. He visited his safe deposit box at the bank in Denver 56 times in 1949, 25 times in 1950, and 18 times in 1951. He visited his safe deposit box in the bank at Littleton 7 times in 1951. On the days of his visits to his safe deposit boxes, petitioner made deposits of currency to his checking accounts as follows:

United States National Bank at Denver

| | |
|---|---:|
| December 28, 1949 | $ 8,000 |
| February 3, 1950 | 5,000 |
| April 17, 1951 | 60,000 |
| April 20, 1951 | 15,000 |

Littleton National Bank

| | |
|---|---:|
| April 27, 1951 | 7,000 |
| April 30, 1951 | 10,000 |

United States National Bank at Denver

| | |
|---|---:|
| May 15, 1951 | 50,000 |

During the period of 1948 to 1951, inclusive, he was engaged in various activities including farming, the operation of a gambling club, horse racing, betting at race tracks and betting upon other events. In 1951 he also financed automobile purchases for one distributor. He generally put his gambling winnings in his safe deposit box rather than in bank accounts.

With respect to his accounting system, the Tax Court found that petitioner kept a number of single entry books in which were recorded various amounts designated as gains realized, income received, losses sustained and expenses incurred. The books consisted of an account book for the year 1948, in which were set forth items designated as income and expenses pertaining to farming operations, horse racing expenses, monthly gambling club operations, election and racing bets. For 1949 he kept a book containing data with reference to gambling club operations, also an account book pertaining to farm operations, an account book pertaining to race track operations and purchases for the year 1949; also books pertaining to gambling club operations, one of which related to the period of time in which the club was operated as a partnership in 1949, and the other for the remainder of the year 1949. He kept a payroll book for operations of the gambling club for the year 1950; also an account book pertaining to his farm operations for 1950; an account book pertaining to operations of the gambling club in 1950, and also election bets, Centennial Race Track bets, earnings and expenses at Ak-Sar-Ben Race Track, and the purchase of the Blakeland property in the year 1950; an account book containing data concerning the operations of the gambling club for the year 1950 and the months of January and February, 1951; a gambling club payroll book for the months of January and February, 1951, which also contained a figure designated as the amount collected during April, May and June, 1951; an account book pertaining to farm operations for 1951, track winnings for 1951, collections of club accounts after the gambling club was closed in 1951; an account book pertaining to 1951 racing barn expenses and the automobile financing deal in 1951; a summary account book pertaining to the operations of the gambling club for the months of January and February, 1951; a payroll book pertaining to farm operations for the year 1951; and a club payroll book for 1951.

For the years 1949 and 1950 and the months of January and February, 1951, petitioner's principal activities were the operation of the gambling club known as the Stockade. When the Stockade opened for the night's business, a bank roll was supplied by the petitioner and his partner, during the existence of his partnership, and thereafter by the petitioner alone. The bank roll varied from $8,000 to $10,000, with larger amounts on weekends and as much as $30,000 on each New Year's eve. The bank roll was placed in the cashier's cage and was used to cash chips presented by patrons when they finished an evening's play. The patrons played mostly on credit. Those who won settled their credit with chips and cashed in any remaining chips at the cashier's cage. Patrons who played on credit and who lost gave checks for the amount of their losses. Amounts that were paid in by patrons who played for cash were placed in a locked box at the table. The petitioner occasionally cashed checks for patrons of the Stockade as an accommodation and for purposes other than the payment of gambling losses. No entries of such checks were made in the records of the Stockade.

Records of gambling operations at the Stockade were kept by petitioner's wife. She first made entries in a small note book in which she noted after the close of each night of operations the letters C.O. and C.B., followed by dollar amounts which purported to represent, respectively, the amounts of cash paid out and the amounts collected in the cash boxes at the gambling tables. The difference between the two amounts was noted in the books preceded by the word "Win" or

"Loss". Patron's checks were not noted as winnings until the day they were cashed, which was usually several days after they were received.

A permanent bound book was kept which purported to contain the transcribed figures from the wife's note books, made within a few days after she made the original entry. It also contained items of expenses of operations of the Stockade entered monthly. Each note book of original entries covered operations for one month. After the transcription from a note book for a particular month was completed, the note book was destroyed. The permanent account book which covered the year 1950 and the months of January and February, 1951, was in evidence. The permanent book for the period of 1948 during which the Stockade was operated and for the year 1949 was lost when petitioner and his wife moved to the Blakeland Farm in 1950.

During 1951 petitioner, O. E. Stephens, financed and stored Hudson automobiles for Fred Ward, a dealer and distributor. Under this arrangement he purchased for cash a number of automobiles, stored them in his barn, and released them from time to time to Ward, upon payment of the purchase price plus $50.00. At least a part of the money used by him came from his safe deposit box. During 1951 he purchased a total of 124 cars at a cost of $278,546.26. He incurred a loss from these operations of $51,959.62.

During the course of the investigation which led ·to the determination of the deficiencies in issue, eight conferences were held with petitioner. On December 4, 1952, he exhibited to the agents the contents of his safe deposit box which consisted of a diamond ring and $21,000 in one thousand dollar bills.

The Commissioner in his determination determined the net income by the net worth plus personal and other nondeductible expenditure method and determined that the income for the years 1949, 1950 and 1951 was, respectively, $64,118.87, $170,430.12 and $79,811.02. In reaching his conclusion, the Commissioner credited Stephens with the following amounts of cash on hand: December 31, 1948, $11,493.18, December 31, 1949 $0.00, December 31, 1950 $0.00 and December 31, 1951 $18,500. The Tax Court in reviewing the Commissioner's findings and determinations made changes and modifications therein. It credited Stephens with the following amounts of cash: December 31, 1948 $60,000, December 31, 1949 $40,000, December 31, 1950 $35,000 and December 31, 1951 $18,500. It also redetermined the value of the real estate in Arkansas and made favorable adjustments to taxpayers therein. It also raised the items of depreciation which were allowed, and made various other minor changes, and based thereon came up with the amounts as found herein, and which petitioners challenge.

We think the Court's conclusion that the taxpayers' books did not correctly reflect total income and that they were inadequate to correctly determine the amount of taxable income finds support in the record. No original books of entry were kept. The monthly books in which entries were made were destroyed as soon as the summary of such records was transferred to the only record which was kept. Neither could income be determined from petitioners' bank accounts because, admittedly, large sums of money were never deposited in the bank. Taxpayers' income was derived from a number of operations, including ranching, farming, sales of real estate, betting on almost anything and operating gambling establishments. The gambling operations, as well as some of his other activities, were financed with cash out of pocket, most of which did not find its way into his bank account. Apparently most of this cash was deposited in his two safe deposit boxes and was withdrawn from time to time. There is no way of determining how much cash was deposited in these safe deposit boxes during any of the years in question.

An increase in net worth, of itself, is not sufficient to charge a taxpayer with income tax evasion. Nor does it, of

itself, justify employment of the net worth method in determining correct income. But when the increase in net worth in a given year is out of all proportion to the declared taxable income it is justification for an inquiry to determine what brought it about. In 1949 petitioners' net worth increased $39,894.17 which together with the allowed deductions of $17,759.77 indicated an increase in assets of $57,653.94 as against a reported net income of $30,835.15. In 1950 the increase in net assets by the consideration of these two items was $158,089.29 as against a reported income of $42,022.-70. In 1951 the increase was $42,388.11 as against a reported net loss of $41,-747.48. One of two things is sure. These increases in net worth, if established, are due either to the receipt of substantial sums of nontaxable income, or they result from unreported earned net income.

■ There is no claim that during the periods in question petitioners received either gifts, inheritances, or other sums of nontaxable income. The Commissioner did find that income could have accrued from any one of a considerable number of enterprises in which petitioner was engaged. We conclude from an examination of the entire record that the net worth method of determining taxable income was properly employed.

■ It is contended, however, that in any event substantial error was committed in the use of the method in determining petitioners' income. The most serious assault is made upon the determination of the amount of cash on hand as of January 1, 1949. In reaching its conclusion, the Tax Court took into consideration the nature of petitioner's businesses, the manner in which he carried them on, the amount of cash in his bank accounts and the safe deposit boxes. It considered that in 1947 and 1948 he borrowed considerable sums from private persons as well as from the bank; and that his safe deposit box when examined in December, 1952, contained $21,000 in cash. From a consider-

ation of all sources available, it concluded that he had a starting cash hoard of $60,000. The only evidence to the contrary is Stephen's statement that he estimated that he had on hand from $100,-000 to $200,000 in cash. His attitude was not at all cooperative in the investigation. He could form no estimate of the amount of cash he had on hand in any of the preceding years. In view of the entire record, the Court was not required to accept his uncorroborated guess as to the amount of cash on hand.

■ It is urged that reversible error was committed in capitalizing certain expenditures rather than treating them as repairs and ordinary expenses. The Tax Court did not find, as stated, that some of the sums spent with the Moore Lumber Company in the years in question constituted repairs. What the Court found was that "Most, if not all, of these expenditures were for improvements, as distinguished from repairs." The same contention is made with respect to money spent with Heckendorf, Elcar Fence Supply Company, Price Plumbing Company, Robbins Electric Company and Schriber Decorating Company. But in each instance the Commissioner made an allocation of the amount spent between capital investments and repairs. There is no showing that the allocation made by the Commissioner and approved by the Tax Court is unrealistic or erroneous. But in any event these adjustments were not questioned before the Tax Court and may not be raised for the first time on appeal.[1]

An objection is also raised with respect to the manner in which the Tax Court treated depreciation. The record does not reveal clearly that there was error with respect to this item. Furthermore, again no objection was raised before the Tax Court with respect to this matter and under the above citation may not be urged here for the first time.

■■ Not much need be said with respect to the contention that the record

---

[1]. General Utilities and Operating Company v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154.

does not sustain a finding of fraud. There is no dispute as to the burden resting upon the Commissioner to establish fraud. An examination of the whole record warrants the statement that there is ample evidence to sustain such a finding. A delineation thereof would serve no useful purpose and would only unnecessarily further extend this opinion to unwarranted length.

A careful examination of the lengthy record compels the conclusion that there is no reversible error and the decision of the Tax Court is, therefore, affirmed.