Paul Karp and Sylvia Karp v. Commissioner. Paul Karp v. Commissioner. Sylvia Karp v. Commissioner.
Karp v. Commissioner
Docket Nos. 59036-59038.
United States Tax Court
T.C. Memo 1958-75; 1958 Tax Ct. Memo LEXIS 155; 17 T.C.M. (CCH) 360; T.C.M. (RIA) 58075; April 29, 1958
*155 Held, respondent's computations of petitioners' net income by the net worth and expenditures method is sustained, with certain adjustments. Held, further, a part of the deficiencies for each of the years 1944 through 1947 was due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939. Held, further, the years 1944, 1946 and 1947 are not barred by the statute of limitations. George M. Bryant, Esq. and Anthony J. Bradisse, Esq., for the petitioners. *156 Mark Townsend, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in income tax and additions to tax in these consolidated cases, as follows: Addition to Tax
Under Section
Docket
293(b) of the
Number
Petitioner
Year
Deficiency
1939 Code
59036
Paul Karp and Sylvia Karp
1946
$60,331.59
$30,165.79
1947
4,584.99
2,292.50
59037
Paul Karp
1944
4,189.64
2,094.82
1945
31,815.35
15,907.68
59038
Sylvia Karp
1944
3,954.64
1,977.32
1945
31,989.00
15,994.50
The issues are (1) whether the respondent was correct in his computation of petitioners' income for the years 1944 through 1947 under the net worth and expenditures method; (2) whether any part of the deficiencies for each of the years 1944 through 1947 was due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Internal Revenue Code; [1] and (3) whether the years 1944, 1946 and 1947 are barred by the statute of limitations. The year 1945 was kept open by waivers timely executed. *157 Findings of Fact Paul and Sylvia Karp, husband and wife, are residents of Los Angeles, California. They filed their Federal income tax returns for the years 1944 through 1947 with the then collector of internal revenue at Los Angeles, California. Mrs. Leah Koslovsky, mother of Sylvia Karp, is approximately 82 years old and was claimed as a dependent by the petitioners in each of the years in issue. Mr. Koslovsky, Sylvia's father, died in 1929 as a ward of the public welfare of New York City. Paul was engaged in the business of selling clothing in two retail stores, one of which was located on Hollywood Boulevard and the other on Wilshire Boulevard in Los Angeles. The Hollywood store was opened several years before the taxable years here in controversy, and the Wilshire store was opened just prior to the period before us. The Hollywood store was transferred in 1946 to Paul's brother, Sol, who was in the military service from 1942 to January 1946. In January and February of 1946 Sol withdrew $6,204.86 from the Hollywood store bank account, and in addition to other assets, received the bank account with a remaining balance of $1,000 when the Hollywood store was transferred to *158 him. Immediately prior to this transfer Sol threatened to bring suit against Paul for a settlement of their respective rights in the business. No suit was actually filed in any court. Late in 1943 Paul also started a tie manufacturing business known as Ty-Craft, Ltd., which sold ties both at wholesale and at retail. Books for the two stores were maintained by an accountant who devoted eight to nine hours each week to such work. Inventories were taken for all of the years here involved by store employees. The principal inventory was taken at the end of 1943 or the beginning of 1944. The accountant who maintained the books was not able to reconcile the bank accounts with the books. No separate cash receipts book was kept for Ty-Craft, Ltd. and some of the Ty-Craft, Ltd. receipts recorded by the accountant were made on the basis of memoranda prepared by Paul. A portion of the sales made by Ty-Craft, Ltd. was for cash. Some of the Ty-Craft, Ltd. sales were not recorded by the petitioners. The cash receipts book for the clothing stores show bank deposits made which were not recorded as sales on the books. The bank accounts maintained by the petitioners show repeated deposits which are *159 not reflected in their books and records. The books and records do not reflect or explain the source of extensive currency expenditures and investments made by the petitioners during the years 1944 through 1947. Petitioners made investments in stocks and bonds and some of the checks received by petitioners from sales of merchandise were endorsed by petitioners directly over to a broker, E. F. Hutton & Co., rather than deposited in the business bank accounts. Petitioners made two loans to Jack Souere in 1946 in the amounts of $5,000 and $2,500. Jack Souere repaid $5,000 in 1947. Paul employed store managers to manage the retail stores. Paul spent much of his time in the manufacturing operation which was located at the Wilshire store, and he also, on occasion, waited on store customers. The store managers supervised the sales help, entered the daily sales in the sales journal (cash receipts book) and checked the daily sales slips with the cash register tapes. Sales slips were made out in duplicate. Paul usually closed the Wilshire store at the end of the day and took the cash receipts home with him. On the following morning the store manager would check the sales slips against *160 the cash register tape and make out a bank deposit slip for the total of recorded sales, less refunds and miscellaneous expenses. These totals were entered by the sales manager in the daily sales book (cash receipts book). The cash receipts book was used by Paul's accountant, who relied upon it, together with the cash register tapes to prepare the income tax returns of the petitioners. During the years 1944, 1945, 1946 and 1947, the cash receipts from many large sales were placed by Paul in a separate compartment in the cash register, after a "no sale" had been registered on the cash register, and such money would be taken home in the evening. At times Paul would take cash receipts and the accompanying sales slip from a salesman and would pocket the cash and destroy the sales slip. Paul's wife, Sylvia, who worked part time, also took sales receipts from the salesmen or saleswomen and did not place them in the cash register. Occasionally there were not sufficient funds on hand to cover a bank deposit prepared by the store managers, and on such occasions a new cash register tape would be prepared omitting some of the sales of the prior day which had already been recorded on the tape. *161 Sales slips on these omitted sales were destroyed. The sales receipts pocketed by Paul or by his wife were not recorded either on the cash register tapes or in the cash receipts book and they were not included in the records maintained by the petitioners' accountant, and from which the accountant prepared the annual income tax returns. Paul Karp and Sylvia Karp were convicted in the United States District Court for the Southern District of California, by jury trial, after pleas of not guilty, of violating section 145(b) of the 1939 Internal Revenue Code in wilfully and knowingly attempting to defeat and evade a large part of the income tax due and owing the United States for the calendar years 1946 and 1947 by filing and causing to be filed false and fraudulent income tax returns. At the criminal trial the petitioners were represented by counsel, both testified, presented witnesses and cross-examined Government witnesses. Respondent computed the petitioners' net income for the years 1944, 1945, 1946 and 1947 under the net worth and expenditures method, as follows: December
December
December
December
December
Assets
31, 1943
31, 1944
31, 1945
31, 1946
31, 1947
Cash in Banks
Hollywood - Bank of America
$ 5,730.41
$ 7,235.43
$ 8,690.76
0
0
Bank of America - Wilshire and
Dunsmuir
2,968.69
7,079.68
7,883.64
[ 334.87)
[ 121.72)
Savings Account - Bank of America
- Wilshire and Dunsmuir
200.53
201.53
203.54
4.55
124.55
Tycraft - Bank of America - Wilshire
and Dunsmuir
6,780.62
(1,779.26)
0
0
Tycraft - Union Bank and Trust Co.
2,482.99
(565.12)
Rent deposits etc.
658.00
825.00
825.00
0
0
War Bonds
375.00
2,300.00
3,893.75
3,387.50
3,425.00
Inventories
19,636.19
25,139.14
27,039.63
56,072.20
66,593.62
Accounts Receivable - Tycraft
0
6,778.62
24,956.32
18,880.42
17,404.87
Accounts Receivable - Sam Schwartz
3,417.20
3,292.20
3,229.70
Securities
12,959.75
12,295.94
17,432.58
32,729.11
39,702.99
Due from Stockbrokers
998.19
Loan to Jack Souere
7,500.00
2,500.00
Investment in Karp and Schwartz
50,520.06
59,766.97
57,723.92
Real Estate - Holly Ridge - Hollywood
5,578.64
5,628.50
5,628.50
Real Estate - Parking Lot - Wilshire -
Burnside
93,143.77
94,114.36
94,114.36
Real Estate - Broadway and Thirty First
11,846.76
11,846.76
Real Estate - Broadway and Twenty
Third Street
8,008.50
8,008.50
Real Estate - 220 West Thirty First
Street
9,130.11
9,130.11
Personal Dwelling
7,100.00
7,100.00
7,100.00
7,100.00
7,100.00
Life Insurance
1,149.50
1,261.90
1,315.65
1,399.95
1,486.40
Leasehold Improvements
3,186.89
3,186.89
3,186.89
3,186.89
Furniture and Fixtures
5,091.68
5,091.68
5,091.68
5,091.68
5,091.68
Automobile
700.00
700.00
700.00
2,300.45
2,582.85
Transfer Check Outstanding
2,000.00
Escrow Checks on Hand
863.50
Dorothy Tobin Check on Hand
25.63
Tulare County Lot
42.00
42.00
42.00
42.00
42.00
$59,798.64
$86,018.43
$261,129.17
$333,630.27
$335,048.97
Liabilities
750.28
1,158.50
Accrued Rentals
$ 37.84
$ 429.81
$ 866.89
$ 478.88
Accounts Payable
3,374.29
3,942.74
9,093.01
5,794.55
16,490.78
Accrued Sales and Excise Taxes
1,014.60
1,505.29
2,450.67
918.07
947.86
Accrued Payroll Taxes
563.52
1,127.30
1,815.00
2,320.42
1,143.92
Due to Stockbrokers
6,167.02
3,188.32
4,109.57
7,083.67
Loan on Personal Dwelling
3,714.92
3,030.79
.80
Loan M. Rosenberg
1,750.00
1,750.00
Loan Lillian Pollant
1,800.00
Loan Mildred Losnick
5,000.00
5,000.00
5,000.00
First Mortgage-Lloyd Co.
45,000.00
20,000.00
Second Mortgage-Minerva Busch
8,000.00
Loan William Buckley
2,000.00
Loan Union Bank #24478
20,833.33
Loan Prudential Insurance Co.
400.00
400.00
Automobile Loan - Bank of America
15-6743
565.87
Automobile Loan - Bank of America
10-3319
178.44
Real Estate Loan - Union Bank 17-R
6513
18,339.06
Loan Murray Siegel
1,800.00
Loan Leah Koslovsky
400.00
Accounts Payable to Reif
470.67
470.67
Reserves for Depreciation: Automobiles
232.46
Furniture and Fixtures
1,677.90
2,057.21
2,436.52
2,815.83
3,195.14
Leasehold Improvements
1,280.00
1,920.00
2,560.00
3,186.89
$18,408.53
$18,001.46
$ 77,973.17
$ 70,836.71
$ 58,819.43
Assets at End of Year
$59,798.19
$86,018.43
$261,129.17
$333,630.27
$335,048.97
Liabilities at End of Year
18,408.53
18,001.46
77,973.17
70,836.71
58,819.43
Net Worth at End of Year
$41,389.66
$68,016.97
$183,156.00
$262,793.56
$276,229.54
Net Worth at Beginning of Year
41,389.66
68,016.97
183,156.00
262,793.56
Increase in Net Worth
$26,627.31
$115,139.03
$ 79,637.56
$ 13,435.98
Add: Living Expenses
4,722.97
4,656.75
2,375.89
2,152.69
Medical expenses not allowable as
a Deduction
582.50
1,043.70
235.85
78.00
Federal Income Taxes not De-
ductible
2,515.88
3,583.64
11,566.72
1,900.00
Less: War Bonds purchased considered
as gifts
(18.75)
(37.50)
Deduct: Total Profits on Capital Assets
(1,524.74)
(3,222.32)
(30.97)
Add: Taxable portion on gain on sale
of Capital Assets
1,221.93
1,611.16
30.97
Add: Total Loss on Sales of Capital
Assets
100.45
Deduct: Allowable Loss on Sales of Capital Assets
Gift to Sol Karp
5,982.43
Taxable Net Income
$34,145.85
$122,811.96
$ 99,779.70
$ 17,629.62
Taxable Net Income per Income Tax
Returns
14,357.38
26,743.87
8,788.00
1,893.83
Unreported Taxable Income
$19,788.47
$ 96,068.09
$ 90,991.70
$ 15,735.79
*162 A comparison of the net income reported by the petitioners in the years 1944, 1945, 1946 and 1947 with the net income computed by the respondent for the same years is as follows: Net Income
Net Income
Determined
Reported by
by the
Year
Petitioners
Respondent
1944
$14,357.38
$ 34,145.85
1945
26,743.87
122,811.96
1946
8,788.00
99,779.70
1947
1,893.83
17,629.62
Petitioners are entitled to a net operating loss carryback from 1948 to 1946 in the amount of $14,166.12. A part of the deficiencies for each of the years 1944, 1945, 1946 and 1947 was due to fraud with intent to evade tax. The returns for the years 1944 through 1947 were false and fraudulent with intent to evade tax. Opinion Respondent was justified in using the net worth and expenditures method in computing the petitioners' taxable income for the years 1944 through 1947. The net worth technique is not a method of accounting. Holland v. United States, 348 U.S. 121. It is a technique which may be used by the respondent even where the taxpayer, as here, offers books which purport to give a true picture of his operations, for the net worth method may provide *163 strong evidence, in itself, that such books are unreliable, Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871. We cannot agree with the petitioners that the use of the net worth method by the respondent was inappropriate for the years in controversy. Petitioners' books were maintained by an accountant who worked on a part time basis and who was unable, through the pressure of duties elsewhere, to maintain a complete set of books. No reconciliation was possible between the cash receipts books of the petitioners and their bank accounts. Through evidence developed at the trial it is apparent that the entries in the books were far from complete. Even where a set of books appears consistent on its face, such books may, in the language of the Supreme Court in Holland v. United States, supra, be "more consistent than truthful", and the respondent may employ the net worth method in seeking out the true income of the taxpayer. Petitioners make the argument that Sol Karp, Paul's brother, was a partner in the business operations during the years 1944, 1945, and a part of 1946. We do not agree. The test to be applied in determining whether or not a *164 valid partnership existed was set forth by the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733: "The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" We cannot find, under the facts of this case, that the parties intended a valid partnership. The evidence presented on this point is meager and highly unconvincing. Petitioners' own accountant was unaware of the existence of such a partnership. No written agreements are in evidence and it does not appear that any were made. Nor is there any satisfactory evidence of an oral partnership agreement. Paul controlled the business during the years 1944, 1945 and 1946, and, except for some nominal sums sent to Sol while he was in the military *165 service, from 1942 through 1946, Paul controlled the earnings of the business with no evidence at all of any intent to share such earnings with Sol. When Sol returned from military service early in 1946 a dispute arose beween him and Paul concerning the rights of Sol in the business and, as a result of such dispute, the Hollywood store was transferred to Sol, together with its inventory and other assets. Sol threatened to file suit against Paul but the suit was never brought. We cannot tell from the evidence what the source of Sol's claim was and it is evident that the allegations made by Sol, through his attorney, in the course of the dispute, cannot be accepted as convincing evidence of a partnership. We hold, under the facts of this case, that the parties did not intend to form a valid partnership during the years pertinent here. Certain amounts and items in the net worth computation prepared by the respondent are in dispute. Respondent has computed a balance of $2,968.69 in petitioners' bank account at the Bank of America, Wilshire and Dunsmuir branch, as of December 31, 1943, while petitioners claim a balance on such date in the amount of $4,637.47. Respondent computed his amount *166 by adding deposits in transit of $3,992.44 to the bank balance of $645.03, and then deducting from the total of $4,637.47 the amount of $1,668.78, representing outstanding checks on December 31, 1943. We agree with the respondent in the method used by him in making his computation. By adding the deposits in transit and then deducting outstanding checks, a true picture is obtained of the bank account at the end of the year. Petitioners dispute the amount of war bonds, $375, shown as an asset under the date December 31, 1943. However, no testimony or evidence was developed at the trial to overcome the presumption of correctness attached to the respondent's amount, and we must sustain respondent. Petitioners dispute the opening inventory used by respondent on January 1, 1944 in the amount of $19,636.19 and contend that the correct amount was $76,472.47. Petitioners have reconstructed their larger amount largely on the basis of estimates and percentages which have no foundation in the record. Some of the estimates are made in an offhand manner by Paul. In the reconstruction of the inventory figures the petitioners have made estimates of their cost of sales by taking a percentage (an *167 estimated 68 per cent which is without substantiation in the record) of the reported sales for the period. This cost of sales is then subtracted from the total of purchases, opening inventory, and other adjustments for that period, in order to arrive at a closing inventory. The entire procedure is permeated with guesswork, and we cannot accept it as even an approximation of the true inventory. Petitioners also presented the testimony of witnesses to the effect that quantities of raw materials were on petitioners' premises at the end of 1943. The testimony was vague. No specific figures were given which can be used by us in aiming at an accurate inventory figure. Moreover, the respondent does give petitioners credit for an opening inventory in 1944 of $19,636.19, and this is certainly not inconsistent with any of the testimony. Petitioners also dispute the inventories used by respondent in his net worth computation as of December 31, 1944, 1945 and 1946, in the amounts of $25,139.14, $27,039.63 and $56,072.20, respectively. These three inventory figures, as well as the inventory figure respondent used for the close of 1943, were all taken from the petitioners' returns. In place *168 of these amounts the petitioners would substitute the amounts of $84,418.74, $33,986.35 and $73,776.74, respectively. We have examined the evidence bearing upon these inventories, as well as the computations made by petitioners in which they seek to reconstruct the inventories, and we cannot find that the petitioners have carried their burden of proving inventories other than the ones used by the respondent. The petitioners have resorted to the use of reconciliation schedules in which they seek to reconstruct the inventory figures by the use of certain arbitrary assumptions. The assume in these reconstructions that the cost of sales approximated 68 per cent over this period, yet this very assumption is abandoned when it would result in an amount which is obviously unrealistic. We have examined the reconstructions at length and are convinced that the results there reached are completely unreliable. We sustain the respondent on the amounts used by him for the inventories at the end of the years 1943, 1944, 1945 and 1946. There is no dispute over the inventory used as of December 31, 1947. Petitioners argue that Ty-Craft, Ltd. had accounts receivable on December 31, 1943 in the amount *169 of $1,000. Respondent did not include any amounts for this item under such date in his net worth computation. The evidence in that Ty-Craft, Ltd. was in operation for a short time in the latter part of 1943 and there is evidence in the form of invoice duplicates that sales were made on credit during this time. However, we cannot determine from these invoices or from any other source, when payment was made on these sales. Therefore, with the evidence at hand, we must use our best judgment in determining an amount of accounts receivable for Ty-Craft, Ltd. at the end of 1943. Cohan v. Commissioner, 39 Fed. (2d) 540. We find that Ty-Craft, Ltd. had accounts receivable in the amount of $750 on December 31, 1943. Respondent computed the item, accounts payable, on his net worth statement for December 31, 1943, 1944, 1945, 1946 and 1947 in the amounts of $3,374.29, $3,942.74, $9,093.01, $5,794.55 and $16,490.78, respectively. Petitioners argue that the correct amounts for the years ending December 31, 1944, 1945, 1946 and 1947 are $6,670.60, $23,080.76, $20,189.18 and $17,470.01, respectively. Petitioners base their claim to these larger amounts on the schedules prepared by *170 an accountant who was employed by them for that purpose in November 1955. For the most part, the accounts payable schedule prepared by the accountant was taken from lists prepared by petitioners' accountant during the years here in controversy. Many of the items were unchecked in any way and it developed on cross-examination that the few items specifically pointed out by respondent were concededly erroneous. Some items were in the wrong years; others were incorrectly designated as accounts payable. There was little done by the later accountant in the way of vertification. We have examined the prepared accounts payable schedule in the background of the testimony developed at the trial and we are not too impressed with its accuracy. However, we are persuaded that the amounts of accounts payable are larger than those used by respondent for the years ending December 31, 1944, 1945 and 1946, and using our best judgment under the circumstances, we find that these amounts are $5,000, $12,000 and $7,500, respectively. Petitioners argue that they had $5,000 cash on hand on December 31, 1943. The respondent does not include any cash on hand on this date in his net worth computation. There *171 is no evidence, apart from Paul's testimony, which we can use to support this contention. Paul's memory, under cross-examination, failed him as to amounts of cash on hand at the end of other years here involved. We did gather from the record, however, that some manner of revolving cash fund was maintained by the petitioners during the years here in issue, probably for the puropse of making cash purchases of materials during the war years. But there is no evidence that this fund varies materially from year to year, and we cannot, therefore, determine any amounts of cash on hand on the last day of each of the years involved. Moreover, even if we did give petitioners credit for cash on hand on December 31, 1943, we could not say that such amount did not remain constant throughout the period, and it is apparent that such a constant amount would have no effect on the increases or decreases in petitioners' net worth during the period before us. We find that petitioners are not entitled to any amount for cash on hand on December 31, 1943. Petitioners make the argument that they are entitled to an additional $37,149.69 in their net worth under date of December 31, 1943. Their basis for this *172 increase is somewhat tenuous. It is based entirely upon a computation made by a former accountant employed by Paul to construct a net worth statement. There is no way of determining the validity of his computations. Moreover, an examination of the computation convinces us that it is not acceptable. Under respondent's net worth computation the net worth of the petitioners on December 31, 1943 was $41,389.66; while the figure used by the former accountant was $99,505.23, a difference of $58,115.57. This difference apparently consists almost entirely of the inclusion by the former accountant in the petitioners' assets of an estimated $35,000 in Ty-Craft, Ltd. inventory and cash on hand of $20,000. Both of these amounts are questioned on the very work papers used by the accountant. We cannot find, on the basis of the evidence presented, that the petitioners are entitled to the increase of $37,149.69 in their net worth on December 31, 1943. Petitioners contend that on December 31, 1946 and 1947 they owed Sol Karp the amount of $7,000. As far as we can determine, this purported obligation arose from the settlement reached between Paul and Sol in their dispute in 1946 over their respective *173 rights to the business. We have examined the various exhibits pertinent to this dispute and settlement and we find nothing persuasive that this obligation did, in fact, arise in 1946. No notes were signed. All we have is the oral testimony of Paul and Sol and, after considering the testimony in the background of the exhibits offered and the lack of substantiation and from our observance of the witnesses themselves, we feel that this testimony cannot be believed. We hold that petitioners did not owe the sum of $7,000 to Sol on December 31, 1946 and 1947. Petitioners also claim that they owned the sum of $25,000 to Sam Schwartz on December 31, 1946 and 1947. Sam was called as a witness and categorically denied that he had ever made such a loan to the petitioners. We have examined the evidence and testimony presented by petitioners on this point and do not find it persuasive. Two of the notes which petitioners testified that they signed in 1946, when the loan was purportedly made to them by Sam Schwartz, were obviously prepared several years later. We cannot accept the notes as authentic. Moreover, it was developed at the trial that a document purportedly signed by Sam Schwartz, in *174 which he acknowledged this loan to the petitioners, was spurious. We hold, on the basis of the entire record, that petitioners did not owe the sum of $25,000 to Sam Schwartz in December 1946 and 1947. Petitioners claim that they owed the sum of $5,000 to Mrs. Jack Souere on December 31, 1947. We have found as a fact that petitioners made two loans to Jack Souere in 1946, one in the amount of $5,000 and the other in the amount of $2,500, and that $5,000 was repaid by Jack Souere in 1947, leaving an account receivable from him on December 31, 1947 in the amount of $2,500. Paul testified that his sister, Mrs. Jack Souere, had loaned $5,000 to him so that he, Paul, could in turn lend this money to her husband, Jack Souere. Paul admitted that he made no payments to his sister, now deceased, or to her estate, purporting to be repayments of such a loan. We cannot make a finding, on the basis of the evidence and testimony, that such a sum was, in fact, loaned by Mrs. Jack Souere to Paul. Petitioners also claim that they received a loan in 1945 of $11,000 from Mrs. Leah Koslovsky, Sylvia's mother, and, in the alternative, make the argument that such sum was a gift to them from Mrs. Koslovsky. *175 The record shows that Mrs. Koslovsky, who was more than 80 years old, had no income of her own and that she was claimed as a dependent on the income tax returns of the petitioners. Petitioners introduced testimony that the $11,000 in cash was left to Mrs. Koslovsky by her husband when he died in 1929. However, there is evidence that the husband, at the time of his death, was a ward of public welfare in New York City. We think that this version of the source of the money is highly improbable and the story that such sum, even if in fact it did exist in 1929, remained intact from 1929 down to 1945, merely adds to the improbability. We cannot find, on the basis of the evidence and testimony presented, that petitioners received the sum of $11,000 in 1945, either as a gift or as a loan. Respondent determined that a part of the deficiencies for each of the years 1944, 1945, 1946 and 1947 was due to fraud with intent to evade tax. Respondent offered in evidence on this issue the judgments of the United States District Court for the Southern District of California, which show convictions under section 145(b) against Paul Karp and Sylvia Karp for the years 1946 and 1947. Petitioners objected *176 to the admission of such evidence. In Stagecrafters Club, Inc. v. District of Columbia Division of American Legion, (D.C.D.C. 1953), 111 Fed. Supp. 127, affd. per curiam, 211 Fed. (2d) 811, the Court said, in considering a similar point: "* * * where the issue in the criminal case was clear, the defendant appeared, was represented by counsel, had an opportunity to testify and present his witnesses and to cross-examine the witnesses against him, and was duly convicted, there is no sound reason why the judgment of conviction should not be admitted in a civil case based on the same facts as at least prima facie evidence of those facts." In Abraham Galant, 26 T.C. 354, this Court, citing the Stagecrafters' case, admitted evidence of a prior conviction under section 145(b) of one of the taxpayers in that case. We think that case is controlling here. The burden rests upon the respondent to prove fraud by clear and convincing evidence, Arlette Coat Co., 14 T.C. 751, and we believe that he has carried that burden for each of the years 1944, 1945, 1946 and 1947. There was testimony by former employees of the petitioners that Sol and *177 Sylvia pocketed cash sales in the store as a regular practice throughout each of the years here involved. There is convincing evidence that many of the sales were unreported on the petitioners' books and were unreported in the income tax returns of the petitioners for those years. At times the cash register tapes were falsified in order to cover shortages of cash which had been taken from the cash register. Some of the receipts from the petitioners' business were endorsed directly over to a brokers' office to cover private investments. A check of the bank deposits made by petitioners revealed deposits which were not reflected anywhere on petitioners' books. Moreover, we think that the consistent understatements of income by the petitioners in their income tax returns for the years before us are further evidence of fraud. Schwarzkopf v. Commissioner, 246 Fed. (2d) 731, affirming a Memorandum Opinion of this Court [TCM 762; T.C. Memo]. We hold, on the basis of all the evidence, that a part of the deficiencies for each of the years 1944, 1945, 1946 and 1947 was due to fraud with intent to evade tax within the meaning of section 293(b). Our finding that the returns with *178 respect to the years 1944 through 1947 were fraudulent, disposes of the statute of limitations issue raised by the petitioners with respect to the years 1944, 1946 and 1947. Section 276(a). Decisions will be entered under Rule 50. Footnotes
1. All references will be to the 1939 Internal Revenue Code↩ unless otherwise specified.